No. 3.—Elijah Bond, claimant, and J. J. Bennett, defendant in execution, plaintiffs in error, *vs.* Moses Baldwin, defendant.

[1.] When there is a rule for a new trial, and the decision of the Court on the grounds taken in the rule is excepted to, it is not competent for plaintiff in error to except to decisions made on the trial, not excepted to at the time, and not embraced in the rule.

[2.] The admission of illegal testimony on the trial, not objected to at the time, is not a good ground for a new trial, and the refusal of a new trial upon that ground will not sustain a writ of error to this Court.

[3.] A certificate in bankruptcy may be attacked and opened in a State Court, when it impedes or conflicts with the rights of a party litigating there, so far as that party's rights are concerned.

[4.] Upon the trial of a claim upon an issue between the claimant and the plaintiff in execution, upon the question of fraud, in the procuring of a discharge in the Bankrupt Court, by the defendant in execution, the mercantile books of a firm, of which the defendant in execution was a member before his application in bankruptcy, are admissible to show that he was owner of an interest in that firm, not returned in his schedule.

[5.] This Court will not control the discretion of the Circuit Court in refusing a new trial, upon the ground that the Jury found contrary to the evidence, but in clear and strong cases of injustice.

[6.] All the acquisitions of a bankrupt, made after the filing his petition in bankruptcy, are exempt from liability to pay debts previously contracted.

Claim, in Bibb Superior Court.   Tried before Judge Stark, January Term, 1850.

In this case the defendant in error joined issue, with a protestation, because the writ of *fi. fa.* given in evidence in the trial of the cause, was not copied in the bill of exceptions; and, also, that certain documentary testimony which was given in evidence in the trial below, did not appear in the bill of exceptions.

The Court held, that the record and bill of exceptions contained sufficient to enable them to decide the points made, and the errors assigned.

A *fi. fa.* issued in 1842, in favor of Moses H. Baldwin against John J. Bennett, from Bibb Inferior Court, was levied upon a negro by the name of Martin, in October, 1845, as the property

of Bennett. A claim was interposed to said negro by George M. Logan, on the 28th October, 1845, which claim was withdrawn by him at July Term, 1848.

George M. Logan and John J. Bennett were merchants and partners in the city of Macon. On the first day of March, 1842, a notice of dissolution appeared in the gazettes published in Macon. Bennett retired, while Logan continued in business.

In October, 1842, the negro boy, Martin, and another by the name of Sam, were sold at Sheriff's sale, as the property of Bennett, and Logan became the purchaser. The Sheriff delivered the negro boys to Logan, who paid the purchase money.

In January, 1843, Bennett filed his petition in bankruptcy, and a certificate of discharge was duly granted in September, 1843.

After the levy, and before the Court to which the *fi. fa.* and claim were made returnable, Logan sold and delivered the negro boy, Martin, to Elijah Bond, the plaintiff in error.

After Logan withdrew his claim, Bond became the claimant.

While the claim was pending, the plaintiff in *fi. fa.* notified the claimant and defendant in *fi. fa.* that he would attack and impeach the decree and certificate of discharge in bankruptcy, on the ground of fraud and wilful concealment by Bennett, the bankrupt; specifying the negro boy, Martin, and the interest of Bennett in the store of George M. Logan; insisting that no real dissolution had taken place, but that Bennett had an interest in the store at the time of filing his petition in bankruptcy.

On the 11th August, 1845, Logan and Bennett formed a new partnership in business, under the firm name of George M. Logan & Co. and Bennett paid into the concern about $3000, with which he was credited on the books.

On the trial of the cause at February Term, 1850, much testimony was submitted to the Jury, of which the following is a brief:—

*William Gunn* stated, that Bond had said he made the trade with Bennett for Martin, but Logan made the title. This conversation was pending the claim by Logan.

*George M. Logan* bought Martin in 1842, and held him until 1845 or '46; made the bill of sale to Bennett, November 13,

Bond and Bennett *vs.* Baldwin.

1845, for the two negroes, Martin and Sam; Bennett was my agent when I purchased these negroes, and having once owned them, he desired to buy them when he got able. On Bennett paying me $900, the receipt in evidence, dated the 13th of November, 1845, was given to Bennett. When Bond bought the negro boy, the proceeds were paid to me, and passed to Bennett's credit, and the reason why I claimed was, because Bennett had not paid all the purchase money. Bennett may have made presents to the negroes.

*James Dean* signed indemnity bond, made by Bennett to Bond, in January, 1849, to secure Bond, and Bennett secured me by notes.

*J. L. Saulsbury* hired Sam in 1844, and had some conversation with Logan and Bennett on the subject; think I gave the note to Bennett; paid the note at Logan's counting-room, but to whom does not know; frequently saw Bennett about Logan's store.

The books of the Merchants' Bank of Macon were introduced, which showed that the note of Saulsbury was made payable to Bennett, and by him indorsed.

The books of George M. Logan were submitted in evidence, to show that there was no dissolution.

*John B. Stow* is acquainted with book-keeping; the books show no partnership and no dissolution.

*George M. Logan,* re-introduced.—The dissolution took place in March, 1842, and was not formed again until August, 1845; Bennett had no interest during that time, either in the store or in the negroes, Sam and Martin; the $3000 entry, made 1st March, 1842, was for Bennett's entire interest in the concern, and the error in the books consists in not charging profit and loss account; there is a credit to Bennett in the books, but it occurred since the new partnership in August, 1845.

In his charge to the Jury, Judge *Stark* stated, that "the discharge in bankruptcy is a full and final acquittance of the defendant from the debt, unless successfully impeached for fraud, and that by sufficient proofs; but if the defendant, at the time of his application for the benefit of the Bankrupt Law, owned the slaves, Martin and Sam, and had a valuable interest in the firm

of G. M. Logan & Co. then it was his duty to have included these slaves, as well as his interest in said firm, in his schedule, and his failure to do so is such a fraud as renders the discharge in bankruptcy a nullity, and you should find the property subject; but if the schedule is a full, faithful and fair account of all Bennett's estate at the time, all the property acquired by the bankrupt, since the discharge, is exempt from the payment of his debts previously contracted."

The Jury found the property subject to the execution; whereupon counsel for claimant moved the Court for a new trial, upon several grounds, of which it is only necessary to give the following:—

1st. Because the Court erred in ruling that the judgment of the Circuit Court, sitting in bankruptcy, could be attacked for fraud, collaterally in this Court, whereas the attack should have been made in the Court where the judgment was pronounced.

2d. Because the Court erred in permitting the books to be submitted to the Jury, as evidence against claimant, or as against John J. Bennett.

3d. Because the Jury found contrary to law and evidence.

4th. Because the Court charged the Jury, " that if the schedule filed by Bennett was a full, faithful and fair account of all Bennett's estate, at the time, all the property acquired by the bankrupt, since his discharge, was exempt from the payment of his debts, previously contracted;" but should have charged, that the acquisitions of the bankrupt, from the *filing of his petition* in bankruptcy, are not subject to the payment of his debts previously made.

The Court overruled the motion for a new trial, and counsel for claimant excepted.

McDONALD, STUBBS, HALL and POWERS, for plaintiffs in error.

HINES & HINES, for defendant.

*By the Court.*—NISBET, J. delivering the opinion.

[1.] Issue was joined in this case with a protest. In the pro-

Bond and Bennett *vs.* Baldwin.

test, it is assumed that no question can be considered by this Court, that is not raised on the rule *nisi* for a new trial. We recognize the correctness of this assumption, and will pass upon no point, made in the bill of exceptions, that is not made in the rule, and for the following reasons : A new trial was moved in this case and refused by the Court. The bill excepts to this decision, and error is claimed to have been committed, and is assigned upon all the grounds specified in the rule for a new trial. This is very well. But the bill of exceptions goes behind the rule, and charges divers errors upon the Court in its rulings *on the trial,* and the assignment, in this regard, follows the bill. These rulings on the trial *were not excepted to at the time,* and not being taken in the rule as grounds for a new trial, were not excepted to in the exception to the decision of the Court on the rule. They have, consequently, no where and at no time been excepted to, and for that reason cannot be considered by this Court. 7 *Howard's Miss. R.* 414. 24 *Wend.* 496. 12 *Ohio R.* 132. 6 *Blackf.* 417. 1 *Scam.* 281. 4 *S. & M.* 113. 7 *Porter,* 270. 2 *Brock.* 75.

The protest farther claims, that the Court shall pass no judgment upon this writ of error, but that the same be dismissed, because the execution which was levied upon the property in dispute, is not sent up. The rule of this Court is, that the plaintiff in error must bring up all the evidence, documentary or by parol, which is necessary to elucidate the questions made for review. If he does not, the defendant has the right to move for a dismission of the writ, and if he fails so to move, the Court will, upon its own motion, confirm the judgment below. Under this construction of our rule, the question is this : is the execution necessary to elucidate any point taken in the bill ? Can we fairly and justly adjudicate all the points made without it ? We think that we can. We see no purpose, whatever, which the execution could subserve, if it was here, but to show the lien and the date of the judgment which is sought to be enforced. There is no contestation, whatever, about the lien of the judgment. On the contrary, throughout the record, the existence of the judg-

ment and its date, are conceded. Upon this ground, we over-rule the protest.

[2.] One of the grounds taken for a new trial in this rule is, the admission of evidence on the trial contrary to law, which was *not objected to on the trial.* It is our opinion that the admission of evidence on the trial, contrary to law, which is not objected to at the time, is not a good cause for a new trial. The party, against whom it is admitted, by not objecting and invoking a decision of the Court, is held to waive his objection, and is bound by that waiver. This being true, it is not error in the Court to refuse a new trial because illegal evidence was admitted without objection, and a writ of error in such a case will not lie to this Court. We do not apply this opinion to this case, but consider it just to the profession to announce, that to this effect will be our judgment whenever the point is made. *Tidd's Practice,* 907, 908, *marg. p.* 1 *T. R.* 717. 1 *Bos. & Pull.* 429, *note a.* 1 *Mills' Const. Reps.* 296. 1 *Wash. C. C. R.* 440. 5 *Pick.* 217. 11 *Pick.* 469. 7 *S. & R.* 219. 4 *Pet.* 102. 11 *Ibid,* 185. 4 *Humph.* 27. 4 *Sheph.* 187. 5 *Blackf.* 436.

I shall not undertake to consider each one of the very numerous specifications of error found in this assignment. There is really but four or five questions raised. In considering them, I shall dispose of the case.

[3.] And first, it is claimed that the presiding Judge erred in holding that the Superior Court had jurisdiction over the certificate in bankruptcy of the defendant in execution, Mr. Bennett. The position taken by the plaintiff in error is, that it is competent to attack and set aside that certificate only in the Court where it was granted. If it is intended to annul, altogether, a judgment, rendered by any Court, as a general rule, the proceeding must be instituted before the Court that rendered it; so as to the judgment in bankruptcy. But it is also true, that if, in the exercise of its rightful jurisdiction, the certificate in bankruptcy impedes or prevents the rights of a party before the Superior Court, or any other Court, it may be there attacked for fraud and opened, so far as that party's rights are concerned. The certificate in bankruptcy was set up in this case in bar of the right

of the plaintiff in execution to collect his money on the judgment out of the property levied upon.    It was introduced to protect the title of the claimant.    We hold that it was competent for the plaintiff in execution to attack it for fraud.    The Act of Congress declares that the certificate may be plead as a full and complete bar to all suits brought in any Court of judicature whatever, unless impeached for fraud, on prior reasonable notice being given of such fraud, &c.    By the Act, the right to impeach it for fraud is given.    See *Bellamy & Co. vs. Woodson,* 4 *Ga. Reps.* 179. *Flournoy vs. Newton,* 8 *Ga. R.* 309.    8 *Alabama R.* 858.

[4.] It is farther assigned for error, that the partnership books of G. M. Logan & Co. were admitted in evidence at the instance of the plaintiff in execution.    The execution was levied upon a slave named Martin, and a claim put in by Mr. Bond.    Aside from the discharge in bankruptcy of Bennett, the defendant in execution, it is not pretended but that the lien of the judgment attached upon the slave.    The claimant plead the discharge, in bar of the lien of the judgment, and the plaintiff in execution gave notice, under the Act of Congress, that he would impeach the certificate of discharge, on the ground of fraud and wilful concealment and suppression in his schedule, returned to the Bankrupt Court, of a part of his effects, specifying the slave Martin and the interest of Bennett, the bankrupt and defendant in execution, in the firm of G. M. Logan & Co.    Logan & Bennett were engaged in business prior to March, 1842, at which time a notice of dissolution appeared, and, as testified by Mr. Logan, Bennett retired from the concern, Mr. Logan continuing the business.    This was before Bennett had filed his petition in bankruptcy.    In August, 1845, Logan and Bennett formed a new partnership.    This was after Bennett's discharge.    The books of the old firm were used and continued for the purposes of the new concern.    The books show no settlement of the first partnership, and no opening of the new firm.    They exhibit a considerable amount standing to the credit of Bennett.    The invoices into the books are, some of them, made out in the name of G. M. Logan & Co. and that during the time that Bennett was stated to be out of the business, Logan bought Martin, and another slave, Sam, in October, 1842,

as the property of Bennett, at Sheriff's sale. In November, 1845, he sold them back to Bennett, receiving a part of the purchase money, and reserving the title to himself until the balance was paid. In January, 1846, Logan & Bennett (Bennett not having paid the balance of the purchase money) sold Martin to the claimant, Bond, Logan making the title. The proceeds of this sale, Mr. Logan testifies, were paid to him, and by him passed to Mr. Bennett's credit on the books. So the books in 1846 exhibit a credit for the purchase money of Martin in Bennett's favor. These facts, in relation to the books, and what they exhibit and what they purport to be, are to be known, that their admissibility may be determined. Now, the issue before the Court was upon the certificate in bankruptcy, and it was this : was there a fraud or not on the part of Bennett, in procuring this certificate, by withholding from his schedule of effects these two negroes, or any interest which he held in them, or by withholding any interest which he held in the firm of G. M. Logan & Co. ? In other words, (for the issue comes down to that,) was Bennett interested in these negroes? and had he, either in the old firm or in the business conducted by Logan, individually, after the dissolution, any interest? The schedule, it is conceded, contains no return of any such interests. If he had no such interests, the allegations of fraud are unsupported; if he had, such interests, failing to return them, his discharge is fraudulent, and ought to be set aside. It was, then, an issue of fact, and the question simply is, were these books admissible to elucidate that issue? Divesting thus this point of the facts extraneous to it, and stripping it of the subtelties which the ingenuity of counsel has thrown around it, we do not consider it very difficult. We have seen that the certificate may be attacked for fraud, when, in this jurisdiction, it is in conflict with the rights of a party. It is set up in this case to defeat the lien of the plaintiff's judgment. It is replied to by an allegation of fraud in this : that the defendant in execution did not make a full return of his effects, with the specifications farther, that at the time of making it, he held an interest in, or was, in fact, the equitable owner of the very slave now levied on; and that he held, and was owner of an interest in the firm of G. M. Logan

& Co. which are not returned. The question then is made, as before stated, was he such owner, or had he such interest? There is nothing in the character of the case (a claim) which will exclude this evidence. The contest is between the plaintiff in execution and the claimant. The plaintiff in execution relies primarily upon the lien of his judgment, which binds all the present property and future acquisitions of the defendant. The claimant sets up the certificate in favor of the defendant in execution, which primarily discharges him and his future acquisitions from liability on the judgment, and thus asserts the nullity of the judgment. The issue on the certificate is tendered by the claimant. He cannot object to the reply which the plaintiff makes to it. He has no legal right to evade the issue; and if so, he cannot object to any evidence legally applicable to that issue. It is as competent for the plaintiff to deny the legal effect of this certificate, as it would be to deny the force and effect of any muniment of title which the claimant might produce. The claimant claims under Bennett; for the evidence is, that he bought of Logan & Bennett, paying the purchase money to Logan, which was passed to Bennett's credit. The parties, no doubt, considering that although the legal title to Martin was in Logan, yet that Bennett was the equitable owner. Bennett is not, technically, a party to the issue, and really has no interest. The *bona fides* of his return is in issue, and upon that, he is in Court represented by the claimant. What right has he to complain? It was plausibly argued, that claimant claimed through Logan, a third person, and therefore, the business relations, between that third person and Bennett, ought not to be adduced to disturb his title; to which it is replied, that if that be so—yet it is competent for plaintiff to show that Logan bought from Bennett, and that Logan's ownership was colorable, and designed, from the beginning, to shield this slave from the operation of the Bankrupt Law—that the title did never pass from Bennett, and therefore, the slave ought to have been returned. In this view of it, the books, showing that the purchase money paid by claimant, was passed to Bennett's credit, particularly taken in connection with other facts, were admissible. Again, the title of Mr. Bond was through Bennett. He was the

virtual vendor, as is demonstrated in his getting the purchase money, and in this: that he indemnified the title by bond and security to Mr. Bond—Mr. Logan being released by Bond on his warranty title to him. Aside from all this, Bond, the claimant, defends against the judgment, by the plea of the certificate. Thence sprang the question of fraud or not. No objection, to my mind, can be made to the admissibility of this evidence, from the relation which the defendant in execution bears to the cause.

The evidence was pertinent to the issue. The books contain statements which were proper to be submitted to the Jury relative to Bennett's interest in the firm of G. M. Logan & Co. The invoices were, some of them, made out in that name, and they exhibited credits standing in his favor to a considerable amount unsettled and unexplained by the books themselves. They show no settlement of the old business, and no opening of a new business. These facts were, in our judgment, proper to be sent to the Jury for them to consider in determining the question of fraud in the certificate. In passing upon their admissibility, we are not to consider the explanations of the books made by Mr. Logan, after they were admitted. The record does not show that any objection was made on the trial to their admissibility. Mr. Logan was examined to explain the books. That was right. Our duty by this record is to say, whether these books, as thus appearing, were upon their face admissible.

Being pertinent to the issue, they were admissible, as containing the firm relations of the partners. They are the records of the firm kept by them, or by a common agent, to which Bennett had access, and are, in the nature of admissions, by all the members of the firm as to the facts which they set forth. They are evidence for the plaintiff to prove fraud, as showing, by the assent of both Logan and Bennett, the interest in the firm which they exhibit Bennett to have held. They ought first to be shown to be the books of that firm. Doubtless they were. No point on this head is made by the record.

We are satisfied that this assignment cannot be sustained.

[5.] One of the grounds taken in the rule for a new trial is, that the verdict of the Jury was contrary to the evidence, and it is

insisted with much zeal, that the Court erred in not granting it on that account. The rule over and over again, laid down by this Court is, that it will not control the discretion of the Court below in granting or refusing a new trial, because the verdict was contrary to evidence, but in strong and unequivocal cases. The verdict must be without evidence, or against the clear and unquestionable proof made in the case. If the evidence is simply conflicting, we will not interfere. Nor will we interfere where the decided preponderance of evidence is against the verdict. Even if the evidence is *slight,* upon which the verdict rests, we will not disturb it. If the verdict is so manifestly unjust as to constrain the Court to believe that the Jury acted from prejudice or corruption, we will set it aside. This belief must be irresistable. It is obvious that the rule cannot in these cases be singly stated in precise words. That the Court below is clothed with power to prevent injustice by setting aside the verdict, is not questioned. To prevent manifest injustice, the Court has paramount authority over the verdict; whilst at the same time it is the appropriate function of the Jury to decide upon the facts. That function we are studiously careful not to permit the presiding Judge to exercise. Whether he will or will not disturb the verdict, is necessarily left to his discretion, regulated by the law as settled in the books. *We* will control that discretion, but with great forbearance, and only when it has been palpably exercised in promoting injustice. His discretion is more latitudinary than ours, and we will not control that by reversing his action, even in cases where, from the record, we might be led to believe we would have acted differently; because, from his position relative to the cause, he has better means of knowing whether the Jury abused their power over the facts, than we can have through the record. See *Roberts vs. the State of Georgia,* 3 *Kelly,* 322, '3. 1 *Kelly's R.* 618. *Mays vs. Stroud,* 7 *Geo. R.* 269. *Flournoy vs. Newton,* 8 *Geo. R.* 311.

We cannot interfere in this case. It falls within none of the cases where we have granted a reversal. It is not a case where there is no evidence to sustain the verdict; the verdict is not against uncontradicted and unimpeached evidence, nor is it so

manifestly unjust as to constrain us to believe that the Jury acted from prejudice or corruption. The Jury found for the plaintiff in execution; they set aside the certificate of bankruptcy; they therefore believed from the evidence, that Bennett either had an interest in the two negroes or in the partnership, which he did not return. Now, it is insisted in the argument, that there is in this record no evidence that he had such an interest, but that, on the contrary, Mr. Logan proves directly that he had no interest in the negroes or in the partnership. Mr. Logan does testify that he had no interest in either, and it is not attempted to impeach his credibility. Yet his testimony is not uncontradicted. The books were in evidence, and they do afford some evidence that he had an interest in the firm of G. M. Logan & Co.; for example, they show a credit in his favor for a considerable sum of money, and exhibit no final settlement of the concern. They show, too, evidence to some extent that he was interested in the business after the alleged dissolution, and whilst it was conducted by Mr. Logan individually. They exhibit invoices made out in the name of G. M. Logan & Co. the old firm name. They also afford some evidence of the ownership of the negroes by Logan, being merely a cloak, and that Bennet was interested in them; for they show that the purchase money paid by Mr. Bond for Martin was passed by Logan to his credit on the books. There is other evidence of his being interested in the negroes. It is proven, for example, by Mr. Saulsbury, that whilst Logan was the alleged owner in 1844, he gave his note to Bennett for the hire of one of the negroes, and this is confirmed by the testimony of Mr. Rutherford, that this note was deposited in bank, and was made payable to Bennett. It is said, however, that this evidence is slight, and ought not to weigh against the positive testimony of Mr. Logan, whose credibility is unimpeached. That may be true. The question is not what we may believe as to the weight of evidence, or what we would have done as Jurymen. The question simply is, was there any conflicting evidence? If there was, we cannot disturb the verdict, because the Jury have the exclusive right to weigh the evidence, reconcile conflicts, and determine what force is to be given to any portion of it. There was some

Bond and Bennett *vs.* Baldwin.

evidence on both sides of the question in this case.    But it is ingeniously argued that Mr. Logan removes the conflict between his testimony and that of the books, that his explanations of the books destroy all proof of what they exhibit as Bennett's interest in the negroes and in the partnership, and that the books are to be considered as evidence before the Jury, as thus explained, and not otherwise.    In this light, argues the counsel, there is no conflict of testimony.    It may be true, in point of fact, that Logan's explanations do altogether neutralize the evidence which the books contain against Bennett.    Still, the books were in evidence as distinct and independent testimony.    So was Mr. Logan's statements, both direct and explanatory of the books.    The Jury had all before them.    It was their province to consider of all the evidence, and they are presumed to have done so, and to have given effect to the explanations. . Having found the issue against Bennett's certificate, the inference which we, as Judges, are to draw is, that the explanations, to their minds, were unsatisfactory.    Again, it is argued that, in considering the books, the Jury looked to other entries than those submitted to them as evidence, and therefore the verdict is against evidence.    The reply to this is, that from the record, the books, as a whole, were in evidence. The record does not show that they were admitted with any limitation or restriction.    We are of course to be governed by the record.

[6.] It is claimed by the plaintiff in error, that the Court erred in instructing the Jury that the acquisitions of the bankrupt, Bennett, made *after his discharge,* were exempted from the operation of the judgment, he holding that all acquisitions made from and after the *filing of his petition,* are exempted.    The law is, as claimed by the plaintiff in error, and we think according to a fair construction of the charge of the Court, he did so instruct the Jury.    The Court says, "if the property was not Bennett's, when he applied for the benefit of the Bankrupt Law, then he had no right to include it in his schedule, and it is not subject;" which is equivalent to saying that the property, to be subject, must belong to Bennett when he applied for the benefit of the Bankrupt Law. If so, the Court meant to say, that property which belonged to

him not until after his application, was not subject. *His application* was the filing of his petition. So, in a like form of expression, the Court again says, " but if the defendant, *at the time of his application* for the benefit of the Bankrupt Law, owned the slaves, Martin and Sam, and had a valuable interest in the firm of Geo. M. Logan & Co. then it was his duty to have included the slaves, as well as his interest in said firm, in the schedule," &c.

The clause which is relied upon as demonstrating the view of the charge taken by the plaintiff, is as follows; " But if the schedule is a full, faithful, and fair account of all Bennett's estate *at the time*, all the property acquired by the bankrupt *since his discharge* is exempt from the payment of his debts previously contracted."

If these remarks were all that was said by the Court on this subject, the true meaning would not be very clear; taken, however, in connection with other parts of the charge, (and that is the only fair way of arriving at its meaning,) we conclude that *discharge*, as here used, has not reference to the certificate and its date alone, but is intended to express the whole process of getting the discharge, which begins with the filing of the petition. Besides, the Court speaks of " all Bennett's estate *at the time.*" What time? It refers to the time previously designated, to wit: the time of his making application to the Bankrupt Court.

Apart from these things, the question is not made by the record, for there is no evidence that Bennett acquired this property intervening the filing of his petition and his discharge.

Let the judgment be affirmed.